# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 26, 2025 Session

## STATE OF TENNESSEE v. DEREK MORSE

**Appeal from the Criminal Court for Hamilton County**
**No. 292556  Barry A. Steelman, Judge**

**No. E2022-00534-CCA-R3-CD**

FILED

APR 17 2025

Clerk of the Appellate Courts
Rec'd by_____

Defendant, Derek Morse, was convicted by a Hamilton County jury of three counts of premeditated first degree murder and one count of attempted premeditated first degree murder. Defendant was sentenced to three terms of life imprisonment without parole for the first-degree murder convictions, and he was ordered to serve a concurrent sentence of fifteen years for the attempted first degree murder conviction. In this direct appeal, Defendant contends that: 1) the evidence at trial was insufficient to sustain his convictions because the State failed to establish his identity as a shooter; 2) the trial court erred by allowing evidence of a prior bad act; 3) the State failed to establish a proper chain of custody for evidence of gunshot residue on Defendant's clothing; 4) the trial court should have granted a new trial based on newly discovered evidence; 5) the trial court should have granted a new trial based on proof that a State's witness gave false testimony that he did not receive favorable treatment from the State for his testimony against Defendant; 6) the State made improper comments during its opening statement and closing argument; and 7) the cumulative effect of these errors entitles Defendant to a new trial. Having reviewed the entire record and the briefs and arguments of the parties, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which MATTHEW J. WILSON, J., and W. MARK WARD, Sp. J., joined.

Brennan M. Wingerter (on appeal), Assistant Public Defender–Appellate Division, Franklin, Tennessee; Daniel J. Ripper (at trial) and Christian Lanier (motion for new trial), Chattanooga, Tennessee, for the appellant, Derek Morse.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Coty Wamp, District Attorney General; and Lance Pope and Cameron Williams, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant, along with his co-defendant Skyler Allen, was charged with the April 9, 2014 shooting deaths of Jon Morris, John "Jake" Lang, and Caleb Boozer and the attempted first degree premeditated murder of Matthew Callan. The four victims lived in the same trailer park on Kelly's Ferry Road in Lookout Valley.

### Evidence of Prior Bad Acts

The State filed a notice of intent to use evidence of an incident involving Defendant that occurred five days prior to the shootings pursuant to Tennessee Rule of Evidence 404(b) for the purpose of showing Defendant's identity, motive, and intent.

In a jury-out hearing at trial, Josh Maples testified about an incident he observed on April 4, 2014, at the Food Lion on Browns Ferry Road. Mr. Maples believed the incident happened during daylight. He was "hanging out" in the parking lot with Andy Everett and Sharon Rogers. He heard what he thought were fireworks and saw "two cars rushing out" from either side of the store. He then heard more gunfire and ducked behind his vehicle. He could not see where the gunfire was coming from. Defendant was driving one of the vehicles, a black Hyundai, and Mr. Morris was driving the other vehicle, which had a passenger Mr. Maples did not recognize. Both vehicles drove away, and Mr. Morris then returned to the parking lot, where he and his passenger switched seats. Mr. Maples testified, "as they're swapping, one of them yelled at us, said, 'You see that? He was shooting at us.'" Mr. Maples and Mr. Everett told law enforcement about the incident after they heard about the April 9, 2014 murders.

Brandon Jackson, Mr. Morris's brother-in-law, was the passenger in Mr. Morris's vehicle. He and Mr. Morris drove to Food Lion to meet Defendant to "get on back a $20 bill that [Defendant] took from [Mr. Morris]'s friend Dan [Antoine]." Mr. Jackson testified that "Dan was supposed to jump in the car and beat [Defendant] up." Mr. Jackson and Mr. Antoine hid behind a dumpster while they waited for Defendant to arrive. When Defendant arrived, Mr. Antoine "kicked the gravel" and Mr. Jackson hit the back of Defendant's car with a tire iron. Defendant then opened the door and "start[ed] shooting" at them. Mr. Antoine "jumped through the woods[,]" and Mr. Morris and Mr. Jackson drove around to the front of Food Lion. Defendant drove around the other side of the store and began shooting at them again. After they switched drivers, Mr. Jackson saw Defendant driving

down the road, so they pulled out and started "racing down the road," and Defendant continued to shoot at them. Mr. Jackson testified it was dark outside when the incident happened.

After hearing the parties' arguments, the trial court found that identity, motive, and intent were material issues. The court found that the State presented clear and convincing evidence of an altercation between Defendant and the others. The court determined that Defendant's prior bad act of firing a gun at Mr. Morris and Mr. Jackson "within five days of the homicide of Mr. Morris, . . . does not rise to the level at which any unfair prejudice would outweigh the probative value." The trial court instructed the jury that it should only consider the testimony for the limited purpose of determining Defendant's identity, motive, and intent and not as propensity evidence.

Mr. Maples and Mr. Jackson's testimony at trial about the incident on April 4 was consistent with their testimony at the Rule 404(b) hearing. Mr. Jackson testified that Mr. Morris had called Defendant to arrange a meeting to purchase marijuana from Defendant as a pretense. Mr. Antoine was going to beat up Defendant and take $20 from him. When Defendant saw Mr. Antoine and Mr. Jackson behind his car, he began shooting at them. After Mr. Jackson and Mr. Morris switched drivers, Mr. Jackson pulled out of the parking lot onto the road in front of Defendant's vehicle, and they "raced all the way down Browns Ferry Road" with Defendant "chasing [them] all the way." Defendant was shooting at them and "trying to run [Mr. Jackson] off the road." Mr. Jackson then "crash[ed] into a ditch at 75 miles per hour." He heard Mr. Morris "screaming for help," but he fled into the woods because he knew he had a warrant for his arrest. Mr. Jackson watched from the woods as first responders extricated Mr. Morris from the vehicle and put him in an ambulance.

*Evidence at Trial About the April 9, 2014 Incident*

On the day of the shooting, Defendant went to Walmart with Michael Shavers. Security footage from Walmart showed Defendant and Mr. Shavers arrive in Defendant's vehicle at 3:50 p.m. and leave at 3:58 p.m. Defendant was wearing a white t-shirt and khaki shorts, and Mr. Shavers was wearing a dark shirt and pants. Defendant was driving his black Hyundai Elantra and carrying his Glock 40. Mr. Shavers testified that Defendant dropped him off at the America's Best Value Inn ("motel") on Patten Chapel Road sometime between 4:00 and 6:00 p.m.

Co-defendant Allen's neighbor, Dennis McNabb, saw Defendant and a "young boy" arrive at co-defendant Allen's residence at 6:15 p.m. Mr. McNabb testified Defendant was driving a "black Nissan." They were not carrying anything when they entered the house, but when they left, Defendant was carrying a ".22 rifle" and something wrapped in a towel.

- 3 -

Defendant put the items in the backseat. Then co-defendant Allen came out of the residence also carrying a .22 rifle and got in the rear passenger seat. Mr. McNabb testified they were at the residence for about ten minutes. Mr. McNabb acknowledged on cross-examination that he did not identify Defendant when police interviewed him on April 25. He said he "didn't know [Defendant] like he knew [Allen]. He didn't come around . . . enough for me to get his name, but I knew him." He said that Defendant was wearing dark clothing.

Mr. Callan, the only survivor of the shooting, lived at the trailer park with his parents. He knew Defendant through mutual friends, and Defendant had previously lived at the trailer park. Mr. Callan was sixteen years old at the time of the shooting. Mr. Morris, who lived with his parents, his sister, and Mr. Jackson, was a family friend. At around 6:30 p.m. on the day of the shooting, Mr. Callan, Mr. Morris, and Mr. Boozer went to Mr. Lang's RV to shoot pellet guns at targets. They smoked marijuana. Mr. Callan was about to leave when a black four-door car drove up the hill and stopped at Mr. Morris's residence.

Mr. Jackson was inside the Morris residence and saw Defendant's vehicle drive up the road to "a dead-end spot at the top of the hill[.]" He recognized the vehicle because it had a dent from his hitting it with a tire iron during the April 4, 2014 incident. There were three people inside the vehicle. Jacob Allison, who is Mr. Shavers's half-brother, was driving the car. The backseat passenger was wearing a hoodie and a bandana over his face. The vehicle stopped in front of the Morris residence "for a few minutes," and Mr. Jackson saw the backseat passenger loading a rifle. Mr. Jackson went into the woods and watched as the car drove to Mr. Lang's RV, where it stopped and turned around and backed up.

Mr. Callan could only see "the outlines of people" through the car's tinted windows. The car turned around and stopped, and Mr. Callan saw Defendant exit the backseat, stare at Mr. Morris, grab a rifle from the car, and "start[] shooting." Mr. Callan said Defendant was wearing dark-colored clothing. Defendant shot Mr. Morris first. Mr. Callan said the bullet "went through" Mr. Morris and hit him, and they were "both face down[.]" Mr. Callan ran into the woods and "got stuck." Mr. Boozer ran past him and "got stuck in a whole bunch of briars and then had to come back up[.]" Mr. Morris "dove underneath the RV," and Mr. Callan thought Mr. Lang was also under the RV, "but apparently he got shot in the head. He never left his chair."

Mr. Callan realized he had been shot in the back. He got up to run and was shot in the arm and collarbone. When he "fully stood back up, [he] got shot in the leg[.]" He then went to the woods and got stuck between a log and a "giant rock." Mr. Callan saw Defendant holding the rifle in a way that looked like "he was out of ammo," and then he saw co-defendant Allen shoot Mr. Boozer with a pistol five times in the chest. Mr. Boozer "begged for his life, saying, 'Please don't kill me. Please don't kill me. I don't even know

y'all.'" Then Mr. Callan saw co-defendant Allen shoot Mr. Boozer "one to two times in the head." Co-defendant Allen shot Mr. Boozer "with a fully extended arm with the pistol in his hand, like, a foot to a foot and a half away from him." Mr. Callan knew co-defendant Allen and had seen him at Defendant's residence when Defendant lived at the trailer park. Mr. Boozer fell and rolled down the hill. Mr. Callan then saw Defendant and co-defendant Allen pull Mr. Morris out from under the RV and shoot him "three to five times in the chest or in the head[.]" Mr. Callan testified, "I couldn't see exactly where they shot him, but he had his hands up, like, waving, and then after they shot, like, his hands just stopped waving." He then heard Defendant say, "'Make sure they're all dead.'" Mr. Callan said he was "20 feet away from him looking right at him when he said it." Mr. Callan closed his eyes and then heard the sound of "gravel moving like people were walking away." When he opened his eyes, he saw them get in the car and leave.

After the car drove away, Mr. Callan pushed over the log that was trapping his foot and tried to walk back up the hill, but he "couldn't make it back up the hill." He managed to walk through the woods to the road and collapsed when he got to the porch of his home. At 7:06 p.m., Mr. Callan's father called 911. A recording of the call was played for the jury. During the call, Mr. Callan's father asked Mr. Callan if he knew who had shot him, and Mr. Callan responded, "No." Mr. Callan testified, "I said no because I was, like, aggravated and I wanted an ambulance. I mean, like, they kept asking, like, a thousand times. It was just annoying me." He also explained that he "wasn't for sure" about his shooter's identity at that time and that the shooter "looked like [Defendant]" but Defendant "didn't have facial hair when [Mr. Callan] knew him before." Later, when Mr. Callan was shown a photo lineup, he was "100 percent sure" Defendant was "the guy."

Mr. Morris's sister, Molly Jean Morris, was lying in bed with her son when she heard gunshots. She ran down the hill "to where [she] heard the voices screaming from[,]" which was Mr. Callan's parents' residence. She saw Mr. Callan lying in the doorway, bleeding, and his parents were "hysterical." Ms. Morris was present when Mr. Callan's father called 911. Ms. Morris went to Mr. Lang's RV and searched for Mr. Morris. She found him under Mr. Lang's RV.

Tennessee Highway Patrol Trooper Charles David McVey responded to the scene. He saw three deceased victims. One of the victims was in a chair beside the RV, and his head was slumped to the side. Another victim was behind the RV, lying "up to his waist" underneath the RV. The third was lying in a fetal position against a tree down a small embankment.

Dr. Steven Cogswell, a forensic pathologist for the Hamilton County Medical Examiner's Office, performed autopsies on all three victims and determined the manner of their deaths was homicide. Mr. Lang suffered five gunshot wounds, all fired from an

- 5 -

undetermined range. The fatal bullet entered Mr. Lang's upper back and lodged in his chest and "did the most damage internally." It caused "internal hemorrhaging such that Mr. Lang really bled to death inside." That bullet, a small caliber bullet, was recovered.

Mr. Morris suffered eight gunshot wounds, all from an undetermined range, with one to the brain being "an instantly fatal shot." Dr. Cogswell recovered five bullets from Mr. Morris's body. The fatal bullet was medium caliber, and the rest were small caliber.

Mr. Boozer's autopsy showed that he suffered fifteen gunshot wounds. Three of the wounds were potentially fatal. The "devastating gunshot wound" was "most likely the last wound delivered[.]" It was fired from an intermediate range, between one and three feet, and it entered Mr. Boozer's forehead, just above the right eyebrow, and traveled downward from right to left. Dr. Cogswell testified this wound damaged a significant portion of the brain and was not immediately fatal but "rapidly fatal." This bullet was medium caliber, and the rest were small caliber.

Hamilton County Sheriff's Office ("HCSO") Detective Rodger Brown investigated the crime scene. Investigators collected one .22 caliber round on the road and sixteen .22 caliber casings at the end of Mr. Lang's driveway. They found one .40 caliber shell casing near the front of Mr. Lang's RV, two .40 caliber shell casings under Mr. Lang's chair, one .40 caliber shell casing in front of the chair, one .380 caliber shell casing to the left of the chair, and one fired projectile in front of the chair. They found one .380 caliber cartridge casing and one .380 automatic cartridge casing under the RV near Mr. Morris's body. They found one .40 caliber shell casing at the top of the hill above Mr. Boozer's body. They also found a .22 caliber shell casing and a projectile near Mr. Lang's chair.

HCSO Sergeant Henry Ritter was assigned as a co-lead investigator on the case. Defendant was developed as a suspect "pretty early" in the investigation, and an officer created a photographic lineup that included Defendant's photo. Mr. Callan viewed the photo lineup at the hospital and identified Defendant as a shooter. Police obtained a warrant for Defendant's arrest.

At trial, Mr. Callan acknowledged that he testified at the preliminary hearing that he "identified [Defendant] because everybody kept saying that it was [Defendant]." He explained that his parents "kept saying that it was [Defendant]" but that he "never actually said, like, [Defendant] did it until [he saw] the picture of [Defendant], and then it was like 100 percent recall." Mr. Callan testified that he "should have been more careful with [his] mouth," but that when he saw Defendant's photo, "it was like a flashback of reliving the whole thing," and he was "100 percent" certain Defendant shot him.

Mr. Allison, Defendant, and someone Mr. Allison's grandmother could not identify, arrived at Mr. Allison's grandparents' home in Trenton, Georgia, at around 7:15 p.m. Investigators determined that the home was a 15-minute drive from the scene of the shooting. Security footage from a Mapco gas station on Highway 136 in Trenton, Georgia, showed Defendant and Mr. Allison enter the store to purchase gas at 7:56 p.m. Defendant was wearing the same white t-shirt he had been wearing at Walmart earlier that day. At around 8:00 p.m., Defendant, co-defendant Allen, and Mr. Allison returned to Mr. Shaver's motel room. Defendant, Mr. Allison, and co-defendant Allen left the hotel shortly thereafter. Security footage from a nearby Subway showed Defendant, co-defendant Allen, and Mr. Allison arrive at the restaurant at approximately 8:15 p.m. Defendant was wearing a white t-shirt and khaki shorts. Defendant and Mr. Allison returned to the motel without co-defendant Allen.

Mr. Shavers said they were acting "real, real strange." He said Mr. Allison "kept looking out the window, just real, like, like he was afraid of something[.]" Mr. Shavers had heard about the shootings on the news, and he knew that police were looking for Defendant. He asked Defendant about it, and Defendant "just said he let his emotions get to him." Mr. Shavers told Defendant that he loved him but that he could not stay at the motel because Mr. Shavers did not want the police to find him there. Defendant gave his car keys to Mr. Shavers, and left the motel with Terry Quarles, who picked him up sometime between 10:00 and 11:00 p.m. Security footage from the motel showed Defendant get into the trunk of Ms. Quarles' vehicle.

On April 10, 2014, at around 4:30 a.m., police found Defendant at Ms. Quarles's residence and placed him into custody. During a search of the residence, police found items of Defendant's clothing, including khaki shorts and a white t-shirt, and Defendant's wallet and cell phone. Officers found a live .22 caliber round inside Defendant's shorts pocket. Special Agent Riley Lewis Gray conducted a gunshot residue analysis of Defendant's clothing for the Tennessee Bureau of Investigation ("TBI"). The testing revealed the presence of gunshot residue on Defendant's clothing. She testified that the crime lab received the items of clothing directly from the HCSO.

HCSO Sergeant Wendell Adams located Defendant's car in the back parking lot at the motel on April 10th. When Sergeant Adams looked through the windshield to get the VIN, he saw two .22 caliber shell casings. When investigators processed the car, they found a live .22 caliber round and the owner's manual for a .380 caliber semi-automatic handgun in the trunk. They also found two .22 caliber cartridge casings under the driver's seat, one on the driver's side floorboard, and one live .22 caliber round in the glove compartment.

On April 12, 2014, Sergeant Ritter spoke to Mr. Jackson, and based on his interview, officers located a Nissan Altima at a wrecker lot. Officers processed the vehicle and found a recent strike mark indicating that a bullet had glanced the vehicle traveling from the rear of the vehicle to the front. On April 17, 2014, investigators collected a .380 caliber shell casing from the Food Lion parking lot.

Mr. Shavers testified that he, Mr. Allison, and Dalton Taylor, Defendant's girlfriend's brother, hid the guns used in the shooting in the woods behind Mr. Taylor's home. Mr. Taylor later sold the .380 pistol and put the other guns in a gun case. On cross-examination, Mr. Shavers admitted that he originally told police that Defendant hid the guns. He also admitted that he "gave a very, very detailed explanation of where [Defendant] hid those guns."

Investigators recovered several weapons in some thick brush down a steep embankment off Interstate 24 eastbound. They found a black, double-sided rifle case, containing a .40 caliber Glock handgun, a .22 caliber Ruger long rifle, and a .22 caliber semi-automatic rifle. Ballistics testing showed that the Glock fired five of the .40 caliber cartridge casings recovered from Mr. Lang's property; the Ruger rifle fired ten of the .22 caliber cartridge casings found at Mr. Lang's property and the two .22 caliber cartridge casings found near Defendant's windshield wipers; and the semi-automatic rifle fired seven of the .22 caliber cartridge casings found at Mr. Lang's property, the two .22 caliber casings found on the floorboard of Defendant's vehicle, and the .22 caliber casing found on Defendant's dash. The .22 caliber bullet found at Mr. Lang's property, the six .22 caliber bullets recovered from Mr. Boozer's body, the .22 caliber bullet recovered from Mr. Lang's body, and the four .22 caliber bullets recovered from Mr. Morris's body bore the same class characteristics as the Ruger and semi-automatic rifles.

Ballistics testing also showed that three .380 cartridge cases recovered from the scene of the shooting were fired from the same gun, but it was not the same weapon that fired a .380 cartridge case recovered from the parking lot at Food Lion. The guns were examined for DNA evidence. One "major contributor" profile was obtained from the Glock pistol for an unknown male, which did not match the samples from Defendant, co-defendant Allen, Mr. Allison, or Mr. Shavers.

On February 11, 2015, Mr. Shavers was arrested on unrelated charges. He and Defendant were incarcerated together at some point in time, and Defendant told Mr. Shavers that he "killed three people." Defendant said that Mr. Allison was driving Defendant's car, that they drove past Mr. Lang's trailer, turned around at the top of the road and went back, and Defendant told Mr. Allison to stop the car. Defendant said they saw people holding guns but that he did not know they were pellet guns. Defendant told Mr. Shavers that he got out of the front passenger seat and started shooting across the top

of the car with a .22 caliber Ruger. Co-defendant Allen got out of the backseat and started shooting with another .22 caliber, and the victims ran. Defendant said Mr. Lang was sitting in a lawn chair, and Defendant shot him "execution style" in the head, then "chase[d] . . . down" Mr. Boozer and killed him. Defendant told Mr. Shavers that he ran out of ammunition in the Glock and "got the .380 from Skyler [Allison] and crawled underneath the RV and shot Mr. Morris." Defendant said they went to Mr. Shavers' grandparents' house in Trenton, Georgia after the shooting and left the guns there.

Defendant told Mr. Shavers about the incident five days earlier at Food Lion and said it was his motive for the shooting. Mr. Shavers denied that he had any involvement in the shootings. He admitted that he lied to police when he told them that Mr. Taylor had hidden the guns. Mr. Shavers acknowledged that he was wearing a dark t-shirt and jeans that day, and he testified that Defendant was wearing a white t-shirt and khaki shorts all day.

Defendant did not testify or present any other evidence. The jury found Defendant guilty as charged and sentenced him to life without parole on each count of first degree premeditated murder. Following a sentencing hearing, the trial court imposed a concurrent sentence of fifteen years for attempted first degree murder.[1]

Defendant filed a timely motion for new trial and amended motion for new trial. At a hearing on the motions, co-defendant Allen testified he was serving a fifteen-year sentence for his involvement in the murders. He testified that on the day of the shooting, Mr. Shavers and Mr. Allison picked him up in Defendant's car, which Mr. Shavers borrowed from Defendant. They drove around and smoked marijuana before going to the trailer park "to scare" some people. He said there were guns in the car, but he thought Mr. Shavers was "joking[.]" He said Mr. Allison was driving, Mr. Shavers was in the passenger seat, and he was in the backseat. He said Defendant was not with them because he was at home cleaning and helping his "overly intoxicated" dad. When they arrived at the trailer park, Mr. Shavers and co-defendant Allen started shooting from inside the car. Co-defendant Allen laid down in the backseat because he "was scared." Mr. Shavers and Mr. Allison exited the vehicle, and they killed the victims. Co-defendant Allen looked up once and saw Mr. Shavers shoot Mr. Lang in the head. Co-defendant Allen said Mr. Shavers and Mr. Allison used rifles to kill the victims and Mr. Shavers also had a handgun. He said he sold the rifles to Defendant the day before and they had test-fired the rifles together. When Mr. Shavers and Mr. Allison returned to the car, they laughed at co-defendant Allen, "calling [him] shaky and telling [him] to . . . man up and stuff like that."

---

[1] Defendant does not challenge his sentences on appeal.

After they left the trailer park, they picked up Defendant and dropped off Mr. Shavers at a gas station near the motel where Mr. Shavers was staying. From there, they went to Mr. Shavers's and Mr. Allison's grandparents' house and then back to "the valley," where they drove around and sold marijuana. They went to Subway and then they dropped off co-defendant Allen at his house. Co-defendant Allen said he "distanced [him]self" from Mr. Shavers and Mr. Allison after the shooting. He denied that he participated in the murders. He admitted that his testimony was completely different from his statement to police, in which he said that he was with Defendant and Mr. Allison in Defendant's car on the day of the shooting. He told police "a vague story that was similar in some degree, but [he] omitted certain details and changed certain things and left Michael Shavers out of it" because he was "afraid to mention him."

The trial court denied Defendant's motion for new trial. This Court waived the timely filing of Defendant's notice of appeal, and this appeal followed.

*Sufficiency of the Evidence*

Defendant contends that the State failed to establish Defendant's identity as a participant in the shooting. Specifically, Defendant asserts that the State relied "almost exclusively" on Mr. Callan's identification of Defendant as a shooter and that his identification "was so unreliable and unsatisfactory that it cannot sustain [Defendant]'s convictions beyond a reasonable doubt." The State argues the evidence was more than sufficient to establish Defendant's identity as the perpetrator.

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13(c). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions

- 10 -

involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

Defendant challenges the proof only as to identity and does not challenge any of the statutory elements of the conviction offenses. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005), *abrogated on other grounds by State v. Miller*, 638 S.W.3d 136, 150 (Tenn. 2021). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)). Circumstantial evidence may establish identity. *Bell*, 512 S.W.3d at 198-99 (concluding circumstantial evidence that the defendant was the perpetrator was sufficient to uphold the verdict).

Prior to trial, Defendant sought to suppress Mr. Callan's pretrial and in-court identifications, arguing that the identifications were unreliable. After a hearing, the trial court ruled that the reliability of the identifications was a "jury question" unless there was proof that law enforcement made the photo lineup impermissively suggestive. The court ruled that the reliability of Mr. Callan's identifications went to the weight of the evidence and was a question of fact for the jury to decide. On appeal, Defendant does not assert that the trial court's ruling was error but rather reasserts the reasons he maintains the identifications were unreliable.

Mr. Callan identified Defendant as one of the shooters in a photo lineup and at trial. He knew Defendant from when Defendant lived at the trailer park. He testified that he saw Defendant get out of the black car, retrieve a rifle, and start shooting at him and Mr. Lang. From the woods, where he lay injured, he saw co-defendant Allen shoot and kill Mr. Boozer, and then Defendant and co-defendant Allen pull Mr. Morris from under the RV and shoot and kill him. He heard Defendant tell co-defendant Allen, "Make sure they're all dead."

Mr. Callan explained that he failed to identify Defendant immediately after the shooting because he was aggravated and in pain. He said he "wasn't for sure" about Defendant's identity as a shooter at the time because Defendant did not have facial hair when he knew him previously. Mr. Callan testified unequivocally, however, that he was "100 percent sure" Defendant was "the guy" when he saw the photo lineup with a more

- 11 -

recent photo of Defendant. He testified that his identification was based on his observations and not on what anyone else told him.

Mr. McNabb also identified Defendant as one of the two men who arrived at co-defendant Allen's residence in a black car shortly before the shooting and retrieved a rifle. Mr. Jackson identified the shooters' vehicle as the same vehicle from which Defendant fired on him at the Food Lion five days prior. Defendant was present with co-defendant Allen and Mr. Allison shortly after the shooting. About the shooting, Defendant told Mr. Shavers that he let his emotions get to him. He later recounted the details of the shooting to Mr. Shavers. When Ms. Quarles picked up Defendant from the motel, he hid in her trunk. Police found a .40 caliber Glock in the woods along with two .22 caliber rifles, which ballistics testing concluded fired several of the cartridge casings recovered from Mr. Lang's property and inside Defendant's vehicle.

Based on this proof, a rational jury could identify Defendant as one of the perpetrators. Any conflicts in the evidence or questions concerning the witnesses' credibility were resolved by the jury as the trier of fact. Defendant is not entitled to relief on this issue.

### Rule 404(b) Evidence

Defendant argues that the trial court erred by admitting evidence of the prior altercation at Food Lion in contravention of Tennessee Rule of Evidence 404(b). The State asserts that the evidence was properly admitted.

Rule 404(b) of the Tennessee Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;
(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b); *see also State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005); *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985). Rule 404(b) is generally one of exclusion, but exceptions to the rule may occur when the evidence of the otherwise inadmissible conduct is offered to prove the motive of the defendant, identity, intent, the absence of mistake or accident, opportunity, or a common scheme or plan. *State v. Toliver*, 117 S.W.3d 216, 230 (Tenn. 2003); *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240 (citing *DuBose*, 953 S.W.2d at 652; *State v. Baker*, 785 S.W.2d 132, 134 (Tenn. Crim. App. 1989)). We will reverse the trial court's decision for abuse of discretion "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

Here, the trial court held a jury-out hearing and determined that identity, motive, and intent were material issues, that the evidence of the prior altercation was clear and convincing, and that the danger of unfair prejudice did not outweigh the probative value of the evidence. Accordingly, we review the trial court's ruling for an abuse of discretion.

In his argument as to the sufficiency of the evidence, Defendant agrees that identity "was a material issue—indeed, **the** issue—at [Defendant]'s trial." (Emphasis in original). He also agrees that the State's theory was that the motive for the shooting was retaliation for the Food Lion incident. He argues, however, that evidence of the prior altercation "had no probative value tending to establish motive, identity, or intent." He further asserts that even if probative of a material issue, the evidence should have been excluded as unfairly prejudicial.

Defendant recognizes that Mr. Morris "was a common party to the two incidents" but asserts that "evidence of the Food Lion incident was not relevant to any material issue in this case unless it involved [Defendant] and the same victims of the shooting at Kelly's Ferry Road." We disagree. The record supports the trial court's conclusion that the prior incident at Food Lion tends to establish Defendant's motive for the shooting. Five days prior to the shooting, Mr. Morris arranged to meet Defendant under the pretense of a drug sale in order to beat and rob him. Defendant then fired a gun at Mr. Morris and Mr. Jackson, chased them down the road, and tried to run them off the road.

The State correctly points out that this Court has stated that evidence of violent episodes between a defendant and a victim are admissible to establish motive for a killing. *State v. Pointer*, No. M2001-02269-CCA-R3-CD, 2003 WL 678376, at *15 (Tenn. Crim. App. Feb. 28, 2003), *perm. app. denied* (Tenn. July 7, 2003). The fact that the other victims

were not involved in the prior incident does not modify this analysis. Neither does the fact that Mr. Jackson was not one of the murder victims despite his involvement in the prior incident. The jury could have reasoned that the other victims were shot to eliminate any witnesses from Defendant's comment to "make sure they're all dead." The jury could also have inferred that Defendant did not know Mr. Jackson was present inside the Morris residence at the time of the shooting.

As it relates to identity, Mr. Jackson explained that he recognized the shooters' vehicle as Defendant's black Hyundai from the prior incident and specifically noted the damage to the vehicle from his hitting it with a tire iron.

Finally, as it relates to intent, the State was required to prove that Defendant acted intentionally and with premeditation. *See* T.C.A. § 39-13-202. The prior incident, in which Defendant fired a gun at Mr. Morris while chasing him in his car, tends to show it was Defendant's conscious objective or desire to kill Mr. Morris.

We cannot conclude that the trial court abused its discretion by concluding that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Furthermore, the trial court provided the jury with a limiting instruction directing the jury not to consider evidence of the prior incident as character evidence or evidence of Defendant's propensity to commit the crimes for which he was on trial. The jury is presumed to have followed this instruction. *See State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). Defendant is not entitled to relief on this issue.

*Chain of Custody*

Defendant contends that the trial court erred by admitting the results of the gunshot residue test because the State failed to establish a proper chain of custody and failed to store the shirt separately from other evidence to prevent cross-contamination. The State contends that the shirt and gunshot residue testing results were properly admitted. Alternatively, the State asserts that any error in admitting the evidence was harmless.

Prior to trial, Defendant filed a motion in limine to exclude his t-shirt and the microanalysis results from evidence, alleging that the State could not establish a chain of custody because the shirt was not listed on the evidence inventory and that the shirt was cross-contaminated because it was packaged with a pair of shorts. After a hearing, the trial court ruled that the State had to establish a proper chain of custody at trial and that Defendant would have an opportunity to challenge the chain of custody. The court found that Defendant's challenge went to the weight of the evidence rather than its admissibility.

- 14 -

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Therefore, the question of whether tangible evidence has been properly authenticated is left to the discretion of the trial court. *State v. Cannon*, 254 S.W.3d 287, 295 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Beech*, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987)). The trial court's determination will not be disturbed in the absence of a clearly mistaken exercise of such discretion. *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998) (citing *Beech*, 744 S.W.2d at 587). This Court will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

To admit tangible evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or must establish an unbroken chain of custody. *Cannon*, 254 S.W.3d at 296; *Holbrooks*, 983 S.W.2d at 700 (citing *State v. Goodman*, 643 S.W.2d 375, 381 (Tenn. Crim. App. 1982)). This rule ensures that "'there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Scott*, 33 S.W.3d at 760 (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, absolute certainty of identification is not required. *See State v. Kirkpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000) (citing *Ritter v. State*, 462 S.W.2d 247, 250 (Tenn. Crim. App. 1970)). In addition, an item may be admitted even if the State fails to call each witness who handled the item. *Cannon*, 254 S.W.3d at 296 (citing *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984)). "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *Kirkpatrick*, 52 S.W.3d at 87. "[W]hen the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence." *Id.* at 296.

Defendant's argument on appeal goes to the weight of the evidence rather than the integrity of the evidence. Defendant asserts, "there was no way to know how, when, or where the gunshot residue got on the clothing." He supposes it could have resulted from the incident at Food Lion, where Defendant fired a gun, or that it could have transferred from Defendant's car, which he claims "the shooters used" on the day of the murders. This is a sufficiency of the evidence argument and not a challenge to the chain of custody.

We agree with the State that the record supports the trial court's admission of the evidence. The State established an unbroken chain of custody. HCSO Sergeant Ritter testified at trial that he collected Defendant's shirt and shorts from Ms. Quarles's bedroom at the time of Defendant's arrest. He wore latex gloves while collecting the items, and he

- 15 -

put them into paper bags, which he transported to the HCSO property room, where he labeled and sealed them with evidence tape. Sergeant Ritter testified that he included the shirt on the "master case supplement" and on the "master evidence inventory list," but he "inadvertently" omitted the shirt from the "property/evidence inventory report." He explained, "I look in the bag, see what's in there, and then write on the bag." The TBI crime lab received the items of clothing directly from the HCSO and tested them for the presence of gunshot residue. The TBI analyst testified that the shirt and shorts were packaged together, that gunshot residue is easily transferable, and that it is impossible to determine exactly how gunshot residue came to be on Defendant's clothing. Defendant's contention that the gunshot residue evidence was unreliable due to contamination goes to the weight of the evidence. The defense was allowed to cross-examine the witnesses about the concerns of cross-contamination or tampering. The trial court did not abuse its discretion in admitting the evidence. Defendant is not entitled to relief on this issue.

## Newly Discovered Evidence

Defendant contends that the trial court erred by denying his motion for new trial based on co-defendant Allen's testimony at the hearing on the motion that Mr. Allison and Mr. Shavers were the shooters and that Defendant had no involvement. The State responds that Defendant has failed to show that he is entitled to relief. We agree with the State.

The determination of whether to grant or deny a motion for new trial based on newly discovered evidence rests within the trial court's discretion. *State v. Walker*, 910 S.W.2d 381, 395 (Tenn. 1995). A defendant who seeks relief in a motion for new trial based on newly discovered evidence must establish: "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." *State v. Caldwell*, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing *State v. Goswick*, 656 S.W.2d 355, 358-60 (Tenn. 1983)). To show reasonable diligence in the first prong, "the defendant must demonstrate that neither he nor his counsel had knowledge of the alleged newly discovered evidence prior to trial." *State v. Meade*, 942 S.W.2d 561, 566 (Tenn. Crim. App. 1996) (citing *Jones v. State*, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970)). To satisfy the second and third prongs, "'[t]he question is not what the jury might do, but, supposing all the evidence new and old to be before another jury, whether they ought to return a verdict more favorable to the defendant than the one returned on the original trial.'" *Goswick*, 656 S.W.2d at 359 (quoting *Evans v. State*, 557 S.W.2d 927, 938 (Tenn. Crim. App. 1977)).

Typically, a defendant will not be granted a new trial where the newly discovered evidence "merely contradicts or attempts to impeach" a witness's testimony at trial. *State v. Sheffield*, 676 S.W.2d 542, 554 (Tenn. 1984); *Evans*, 557 S.W.2d at 938 (stating that a new trial will not be granted upon the ground of newly discovered evidence where the

evidence has no other effect "than to discredit the testimony of a witness at the original trial, contradict a witness's statements, or impeach a witness, unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow"). However, "if the impeaching evidence is so crucial to the defendant's guilt or innocence that its admission will probably result in an acquittal, a new trial may be ordered." *State v. Singleton*, 853 S.W.2d 490, 496-97 (Tenn. 1993) (citing *State v. Rogers*, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985); *Rosenthal v. State*, 292 S.W.2d 1, 4-5 (Tenn. 1956); *Evans*, 557 S.W.2d at 938).

We conclude that the trial court acted within its discretion in denying Defendant's motion for new trial. At the hearing on the motion, defense counsel told the court he waited until co-defendant Allen had resolved his charges and was no longer represented by counsel to approach him. This explanation alone is not a sufficient showing of reasonable diligence in discovering the evidence sooner. Defendant also has not established that co-defendant Allen's testimony would have likely changed the outcome of Defendant's trial. Considering all the evidence, new and old, before another jury, co-defendant Allen's testimony would have merely conflicted with other evidence that was presented. The trial court found that co-defendant Allen was not a credible witness and that the jury would likely have discredited his testimony. *See State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) ("An assessment of the witnesses' credibility by the trial court is essential in order for the trial court to determine whether the evidence is likely to change the result of the trial." (emphasis added)). In light of all the incriminating evidence presented against Defendant, co-defendant Allen's testimony would not have changed the outcome of Defendant's trial. Defendant is not entitled to relief on this issue.

*New Trial Based on False Testimony*

Defendant argues that the trial court erred by denying his request for a new trial based on proof that Mr. Shavers gave false testimony at Defendant's trial. Specifically, Defendant claims that Mr. Shavers gave false testimony (1) when he testified that he had not been offered any kind of deal or agreement in exchange for his trial testimony and (2) when he said that he did not "expect to, hope to, or even want to receive anything in exchange for his testimony." The State responds that Defendant has failed to prove his first claim of false testimony by a preponderance of the evidence and that his second claim of false testimony is waived because Defendant raises it for the first time on appeal.

The State may not knowingly present false testimony and has an affirmative duty to correct the false testimony of its witnesses. *See Giglio v. United States*, 405 U.S. 150, 154, (1972); *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). The State's failure to correct false testimony of a witness violates due process of law as guaranteed by

the United States and Tennessee constitutions. *Giglio*, 405 U.S. at 153-54; *Spurlock*, 874 S.W.2d at 618. In order to obtain a new trial, "a defendant must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip v. Oklahoma*, 604 U.S. ___, 145 S. Ct. 612, 626 (quoting *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)). If the defendant makes that showing, then "a new trial is warranted so long as the false testimony" is material in that it "'in any reasonable likelihood [could] have affected the judgment of the jury.'" *Glossip*, 145 S. Ct. at 626 (quoting *Giglio*, 405 U.S. at 154).

Mr. Shavers testified at Defendant's September 2017 trial that he had pending charges for two counts of attempted first degree murder. He denied that he had any agreement with the State about resolving his charges in exchange for his testimony against Defendant. Mr. Shavers pleaded guilty in June 2018 to two counts of attempted second degree murder in exchange for an effective ten-year sentence to be served on probation. *State v. Shavers*, E2019-01558-CCA-R3-CD, 2020 WL 3791500, at *1 (Tenn. Crim. App. July 7, 2020), *no perm. app. filed.*

Defendant asserts that Mr. Shavers "likely gave false testimony" when he said he did not have an agreement with the State "about any consideration that [he] [would] receive as a result of [his] testimony" against Defendant. Defendant further asserts that Mr. Shavers "clearly gave false testimony" when he denied that he "hope[d]" or "expect[ed]" to receive a favorable sentence from the State in exchange for his testimony against Defendant. At the hearing on Defendant's motion for new trial, however, defense counsel acknowledged, "we don't have any proof of that, but he did subsequently, after this case was over, he did get a probation deal[.]" Defendant cited a news article in his motion for new trial that stated Mr. Shavers received a ten-year probated sentence after testifying against Defendant, and he cites another article in his brief to this Court, which states that Mr. Shavers received a reduction in his sentence "bec[au]se" he testified against Defendant.

We first note that neither of the articles cited by Defendant are properly in the record before us as the first was not made an exhibit to the hearing and the second was not presented to the court for its consideration. *See* Tenn. R. App. P. 24(b); Tenn. R. App. P. 13(c). Moreover, we are not permitted to take judicial notice of the contents of news articles. *See State v. Henretta*, 325 S.W.3d 112, 144 (Tenn. 2010) ("While Rule 201 of the Tennessee Rules of Evidence allows a court to take judicial notice of certain adjudicative facts, it does not allow a court to take judicial notice of hearsay statements contained in a newspaper article."). Regardless, the articles do not establish that Mr. Shavers had an agreement with the State at the time of Defendant's trial.

Defendant's contention that Mr. Shavers's testimony that he did not hope for or expect a deal in exchange for his testimony is false was not presented to the trial court in the motion for new trial. *See* Tenn. R. App. P. 3(e). In his amended motion for new trial, Defendant asserted that Mr. Shavers "falsely testified that he did not accept a plea agreement in order to receive a sentence reduction." At the hearing on the motion, defense counsel argued only that the State gave Mr. Shavers a sentence of probation in exchange for his testimony. Defendant has waived the issue. Waiver notwithstanding, Defendant has not established by a preponderance of the evidence that Mr. Shavers's testimony was false, merely asserting that the testimony must have been false, and Mr. Shavers's hopes and expectations at the time of Defendant's trial are not material and there is no reasonable likelihood that they could have affected the jury's verdict. Defendant is not entitled to relief on this issue.

*Prosecutor's Improper Comments*

Defendant asserts that the prosecutor made improper comments during opening statements and closing arguments. Specifically, Defendant takes issue with the prosecutor's references to an "execution-style" shooting and the prosecutor's comments that Defendant "likes Glock 23s" and that gunshot residue on Defendant's clothing was "forensic corroborative evidence that [he was] one of the shooters." Defendant acknowledges that he failed to contemporaneously object to the latter two comments and asserts that he is entitled to plain error relief. He asserts, however, that the prosecutor's references to "an execution-style" shooting is subject to plenary review because although he did not make a contemporary objection, he objected, and the trial court sustained his objection, to the medical examiner's testimony that the shooting was "execution-style." The trial court ruled that the medical examiner could not use the phrase "execution-style" because "there is no medically recognized definition of an execution shot."

Our supreme court "has long held that a defendant's failure to contemporaneously object to alleged prosecutorial misconduct during closing argument results in waiver of the issue on appeal." *State v. Enix*, 653 S.W.3d 692, 700 (Tenn. 2022). "[P]lain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for new trial." *Id.* at 700-01.

We disagree that the trial court's ruling as to the medical examiner's testimony was sufficient to preserve an objection by Defendant to any other such references throughout the trial and closing arguments. Moreover, the court specifically limited Dr. Cogswell's testimony, but added, "I'll allow the State to argue a particular point about whether this was execution-style. . . ." The State, on appeal, stretches the trial court's ruling and asserts the State "was acting in accordance with the trial court's ruling that it could use the term

- 19 -

[execution-style] during argument." Nevertheless, Defendant did not object to the State's use of the term, nor did Defendant object when Mr. Shavers testified that Defendant told him he shot Mr. Lang "execution-style" in the head.

Because Defendant failed to object to any of the comments about which he complains contemporaneously with the comments, we will review the comments for plain error. Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000). When it is clear from the record that at least one of the factors cannot be established, this Court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." *State v. Reid*, 164 S.W.3d 286, 343 (Tenn. 2005). "Trial courts should allow the presentation of a summary of the facts supportive of the respective theories of the case, only so long as those facts are deemed likely to be supported by admissible evidence." *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012). "Opening statements, while not evidence, must be predicated on evidence introduced during the trial of the case." *Id.*

We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. Hill*, 333 S.W.3d 106, 131 (Tenn. Crim. App. 2010) (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Although not exhaustive, this Court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

An appellate court should not lightly overturn a criminal conviction "solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001)). An improper closing argument constitutes reversible error only if it "is so inflammatory or improper that [it] affected the outcome of the trial to the defendant's prejudice." *Id.* (citing *State v. Thacker*, 164 S.W.3d 208, 244 (Tenn. 2005) (appendix); *State v. Cribbs*, 967 S.W.2d 773, 786 (Tenn. 1998)); *see also State v. Jackson*, 444 S.W.3d 554, 591 n.50 (Tenn. 2014).

In determining whether a prosecutor's closing argument crossed the line of propriety and affected the outcome of the trial to the defendant's prejudice, courts focus upon the following five factors:

(1) the conduct complained of, viewed in light of the facts and circumstances of the case;
(2) the curative measures undertaken by the court and the prosecutor;
(3) the intent of the prosecutor in making the improper statement;
(4) the cumulative effect of the improper conduct and any other errors in the record; and
(5) the relative strength or weakness of the case.

*Jackson*, 444 S.W.3d at 591 n.50 (citing *State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (adopting the five-factor analysis enunciated in *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976))).

During opening statements, the prosecutor told the jury, "[T]hey shot Caleb Boozer 15 times, and you'll hear from the medical examiner that one of those shots to the right side of his forehead was an execution-style shot, execution-style shooting." Before Dr. Cogswell testified, however, the trial court sustained Defendant's objection to his referring to a close-range killing as "execution-style" because "there is no medically recognized definition of an execution shot." During its closing argument, the State told the jury that "the defendant executed [Jake] Lang," and "then he hunt[ed] the [other victims] down one by one and execute[d] them."

Defendant concedes, "it does not appear that the prosecutor intentionally misstated the evidence or misled the jury" and instead contends the argument "was improper because it was not based on admissible evidence." However, the evidence showed that Mr. Lang was shot three times in the head and once in the back of the neck, a killing that, according to Mr. Shavers, was described by Defendant as "execution style." Mr. Morris was shot in the mid-brain, and Caleb Boozer was shot just above the right eyebrow from a distance of two to three feet. Mr. Callan testified that Mr. Boozer begged for his life before co-

defendant Allen shot him in the head. We conclude that the proof supports the prosecutor's statements. The trial court's limitation on Dr. Cogswell's use of the term "execution" because it is not a medically defined term did not prevent the State from arguing to the jury that the killings were committed in such a fashion that the jury could reasonably conclude they were executions.

With regard to the other two comments by the prosecutor about which Defendant claims he is entitled to plain error relief, he asserts that the State misled the jury as to the inferences it could make and that the proof did not support the prosecutor's statements that Defendant "likes Glock 23s" and that gunshot residue on his clothing was forensic corroborative evidence that he was one of the shooters. Defendant argues there was no DNA evidence connecting him to the firearms used in the shooting and that there was no proof that the gunshot residue on Defendant's clothing was connected to the incident.

Although there was no evidence that Defendant "liked Glock 23s," Defendant owned a Glock 40, was armed with his Glock 40 on the day of the shootings, and law enforcement found a .40 caliber Glock pistol among the weapons recovered from the side of the interstate. The prosecutor's statement was not a misstatement of the evidence but rather a reasonable inference from the evidence presented. Similarly, the prosecutor's statement that gunshot residue on Defendant's clothing was forensic corroborative evidence that he was one of the shooters was not improper. As we concluded earlier in this opinion, the gunshot residue evidence was properly admitted, and that it was deposited on Defendant's clothing at the time of the shooting is one reasonable inference to be drawn from the evidence. Another reasonable inference, which defense counsel argued to the jury, was that it was transferred to his clothing from his car, which the shooters drove on the day of the shooting. Defendant has not established that a clear and unequivocal rule of law was breached. He is not entitled to relief on this issue.

*Cumulative Error*

As his final issue, Defendant argues that the cumulative effect of the trial court's errors "all intertwined to deprive [Defendant] of a fair trial." The State responds that Defendant has not established multiple errors entitling him to relief.

The cumulative error doctrine applies when there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To that end, more than one actual error in the trial court proceedings must exist before the cumulative error doctrine can apply. *Id.* at 77. No error

at all renders the cumulative error doctrine fruitless and Defendant is not entitled to its utility.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

s/Timothy L. Easter
TIMOTHY L. EASTER, JUDGE